Case number 172369, Kevin Keogh v. Concentra Corporation. Argument not to exceed 15 minutes per side. Mr. Palmer, you may proceed for the appellate. Good morning. Good morning. One moment. If he lost any time, give it back to him. Ask him to wait. Thank you. Good morning. Good morning. Robert Palmer appearing on behalf of Dr. Kevin Keogh, the plaintiff in this case. I'd like to reserve three minutes of rebuttal time. Very well. This case presents a case where the district court, as well as defense counsel, have repeatedly misapplied the law and made errors of fact. I realize that coming before this court, errors of fact is a tough road to go, but I think this case presents a glaring example of some errors made by the district court judge that took this case away from the province of the jury. The first area that I want to talk about briefly was notice. As this court is aware, the plaintiff brought claims under the Family Medical Leave Act, as well as the ADA, and they kind of overlap. The theories are very similar on both of them. He wanted one or both, and the notice issues and the pretext issues, basically it's kind of the same issue with respect to both of those particular claims. Before you get into making an argument, on the issue of notice, doesn't there have to be a clear and unequivocal statement of request in order for the notice to be sufficient under the applicable law? What you have to do is you have to provide information that is sufficient to put the employer on notice that the FMLA or the ADA are in play. The focus is on what the employer knows and what the employer thinks, not what the employee knows or the employee thinks. In this particular case, Judge Stee and defense counsel have taken great issue with the fact that Kevin Keogh said, I'm investigating, but he wasn't investigating what was involved. He was investigating whether or not to take a Family Medical Leave Act intermittent leave or alternatively to take an accommodation. He specifically said to them, to answer your question specifically, he said to them, I have a bad back, I can't work these hours, I'm investigating whether to use ADA or FMLA. He never equivocated on his need for the time off. What he did is he was indicating his investigation was as between those two alternatives. And the employer was supposed to discern from that statement of investigation that he had made a decision to access the leave. He specifically said to both Ms. Thomas and to Tearshort, my back, I can't work the nine hours, I need to work less hours because of my back. A clear statement, I can't work the current nine hours. So it was very specific. What he was not specific on was, I don't know whether it would be an ADA or an FMLA leave, but I can't do it anymore. He also wasn't specific as to what kind of accommodation he wanted. Well, there were several. First of all, he wanted to work in, these are concentric clinics and they're all over. And he had a terrible history of chronic back problems and he couldn't sit down. And so he needed to stand up. So what he asked for was two things. He asked for the ability to only be, as the court knows, on August 11th they docked him and reassigned him as a float physician. As a float physician, he had no entitlement to any particular facility. So as soon as he got in that situation, some of the facilities would allow him stand-up computers and the ability not to have to sit down. So he specifically said, as an accommodation, I want to work only in those centers where I can stand. And then he also said, I cannot work nine hours. I need a break on the hours that I am going to have to work. So it was very specific requests as to what he was seeking. What was the nondiscriminatory reason they gave? The nondiscriminatory reason they gave is they said he had behavioral issues and tardiness. Did he? Yes. Up until the point where he... So what happened is he was a great clinician. He was not a great bureaucrat. And he pushed back on every part of the mantra, the playbook and things like that. As a result of that, he got removed as an administrator. On August 11th, they docked him. They demoted him. They turned him into a float physician. So these behavioral pushback, the thorn in the side of the bureaucracy, was completely resolved at that point. He had no behavior problems after he was demoted? What happened after he was demoted is Thomas came in on a particular day and was saying, your morale here is bad. You were tardy today. And he pushed back on that and wrote back saying, I'm not the problem. Was he tardy after the demotion? I thought he was. He was tardy. Okay. He was tardy. That's a behavior problem, isn't it? That's nondiscriminatory? He was tardy on the 27th and he was told not to be tardy again. And he was, in fact, tardy. Wasn't that a nondiscriminatory reason justifying the firing? No. And the reason being because he was a 20-year skilled clinician, never had a problem before. Tardiness was never used against any of the hundreds of physicians and PAs that worked for them. And in point of fact, Suzy Francoeur testified that she was specifically told by the same supervisor that is the one, Ms. Thomas, who was writing up Dr. Kehoe, that tardiness was acceptable. Don't worry about it. As long as you get the job done. Specific discussion about it. And then they turn and the only person that they focus on, on the tardiness, is Dr. Kehoe. And that, in my mind, is why this becomes a jury question. He had been placed on a specific performance plan and issues had been included therein for which he was to comply. I mean, they were trying to get his behavior within those limits. And what's wrong with that? There's nothing wrong. We don't question the performance improvement plan. We don't question the demotion. So was it timeliness and not being tardy a part of that? No. It was not. Tardiness was a new ball that was thrown in. And he was told, as I said, it's our position that it was a pretextual reason. This is a guy who, you know, it was basically utilized when he brought up the FMLA and the ADA situation. What was the time lapse between the demotion and the time he was fired? He was demoted on August 11th. On August 11th was the demotion. He was changed to the position of a float doctor from his other position. On August 27th, now that he's in the new position, his supervisor shows up and they have a discussion about the morale in the place and the fact that he was tardy on that particular day. On that same day, because of the fact that this is going to require him to be there the full nine hours, he was sort of trying to get his work done in the time parameters. When he realized that they were going to say that you have to be here on time, he said, I can't do it. My back is killing me. I can't do nine hours. I need an accommodation or I need FMLA. I used to be the guy who was there for you six days a week, nine hours a day. I can't do it anymore. I need an accommodation. He says it on that day. The very next day, this is a supporting record. Then on the following day, August 28th, Dr. Thomas turns the discussion on the 27th into a final warning and writes them up on a disciplinary thing saying your behavioral issues are a problem and you shouldn't be tardy. He then calls up the HR person and again says I need the accommodation or I need alternatively FMLA leave because I can't do this. I need to only work in places. That's on September 5th. On September 8th, he has a one-on-one discussion with the HR guy about his accommodation request. The HR guy, Tom T-shirt, says sit tight. Not here are the forms. Sit tight. Then on September 12th, they have a panel call. Although they claim privilege and didn't want to talk about what was said on the panel call, they acknowledge that the things that were talked about was his behavior and his request for accommodation and ADA and FMLA relief. That would normally have no part in a panel discussion, but they actually acknowledge they talked about it on the day that they had the panel call where they're deciding what are we going to do with Dr. Kehoe. The panel call is not an automatic termination. What do you mean by panel call? He was a doctor and under his contract, before they could take significant discipline against him, before they could do anything to him because of his existing contract, they had to convene a panel call of all of the authorities within the company to discuss what are we going to do with him. It's not an automatic termination. Up until that point, he was still working. So they have the panel call and on that panel call are the two HR people that knew about his ADA request and his FMLA request and they testified that during this panel call, which is a discussion that's supposed to focus on discipline, they talked about the fact that he wanted ADA and FMLA leave. So what we had in this situation... So they acknowledged that he had, in fact, made a request for leave. Oh, yeah, yeah. The HR guy said, yeah, I told him to sit tight on it. And then the powers that be in the meeting are talking about his request. He didn't really apply, did he? I mean, he said he might apply for it. No, he said... I'm thinking of applying for it or, you know, it might... He said, I'm investigating which one to use. I'm thinking whether I'm going to apply for FMLA leave. So he hadn't done it, right? What he did is he told his supervisor that I'm seeing my doctor on September 3rd to see the specifics of exactly how much time I need off. He said that as well. She told him to talk to HR. He talked to HR. He called HR, talked to HR and specifically told them that and rather than say, here are the forms, rather than engaging in a discussion or that, he was told to sit tight. And then while he's sitting tight, all the powers get together and they have a meeting and during the course of the meeting that's supposed to be talking about his tardiness, they talk about his ADA and his FMLA. Your theory is that he's fired because he was going to apply for FMLA leave and they wanted to fire him so he wouldn't get on the leave. Is that... My theory was it was in process. He told them he needed one or the other. He was going to his doctor. He's not fired for his bad conduct at work. That was very well documented but he's fired because he was going to apply for FMLA leave and they didn't want him to do that. I mean, that's what you'd argue to the jury, I assume. That's what I would argue to the jury, exactly. But I thought you told me just a minute ago that he had already made a request for leave prior to the termination. He said, I can't work these hours. I need to have... I mean, had he made a request, formal or informal, for leave prior to the termination? I would say he certainly did. He said, I can't work the nine hours. I need to work less. And you say that HR admitted that he had requested. Yes. I don't know that I saw that in the record but I will... I don't think it is in the record. I think he's characterizing. What he thinks those words could have meant, I think. I think that panel, they did testify. They talked about the fact that he was seeking. Seeking is a future tense as opposed to a past tense. I think the question was, had he made the request, seeking is something of the future, not the past. I mean, be it as it may, I think perhaps you can have retaliation for a prospective claim. He might be. I don't know. He also then, and I know my time is up, he had been very specific about wanting to be only assigned to places with stand-up desks. That's a very specific request. And he had made that request. And was that denied? They hadn't got to that point yet because that's when they... Okay, so how can you have a claim for denial of accommodations if it hasn't even gotten to that point? I mean, I thought that wasn't one of the claims, wasn't it? It was. You hit the nail on the head. It's essentially a retaliation claim. All right, thank you. Good morning. Good morning, Your Honor. Commissar Paxson on behalf of Concentra, the defendant. Your Honor, I think the question that has been asked hit the nail on the head. In this case, Dr. Keough, who was a longtime employee, in fact, this was his practice that was purchased by Concentra. There was a separate agreement with Dr. Keough, and that's where the panel call comes in. That was part of his contract. He did not want to deal with the corporate aspect, in his words. I think at one point in time he used the word corporate, but in that fact, that was the attitude that was displayed. He refused to model our corporate policies. Wasn't he going to sign his thing Wile E. Coyote or something? At one point in time he signed it Wile E. Coyote. That was a pledge to follow the company policy, and rather than sign his name, he signed Wile E. Coyote. Yes, he did. That was a little lack of seriousness. He greeted our staff as ladies and genitals. Ladies of what? Genitals. In any event, it's an interesting argument that the plaintiffs have made at that point in time that because that was all the basis as we were going into the motion for summary judgment, and Judge Stee had that in front of him, and as we came in, they said, okay, we're not going to argue anything about what he did beforehand. We're just going to look at the time that he was demoted, and they've taken that and tried to turn that into a case law. After he was demoted, if that was the punishment for the other things being late, missing meetings and all that, why did they demote him and then fire him three weeks later? Well, they already punished him for not being in an organization. Well, first of all, this was not punishment. This was a way of putting him in a position that he couldn't continue to do the poor behavior that would be modeled towards him. Are you looking at him as a punishment? No, I think it's placing him in a position where he can't create any more harm. He was the center medical director. He was the person at that center that was the embodiment of our policies of putting people through. And because he couldn't comply with that, either with his attendance or otherwise, we couldn't have him there trying to enforce those same policies. So we moved him as a... Did he miss any meetings or anything between the time he was demoted and the time he was fired? Yes, yes. In fact, he made inappropriate comments afterwards, where he was asked... I thought the question was, did he miss any meetings? Was that the question? I don't think there was a specific meeting. And what he did miss is he missed being at the center to provide the services that we advertised that we're going to. Remember, these are specific clinics where we advertise to our clients and to our patients that there will be a physician on premises to see you when you come in during the hours that we're open. If he's late by an hour, hour and a half, he's not there. And in most of these centers that he was now the float physician, he was the only physician. So we could not provide that service there. So I count that as a meeting. He can't provide the services. Secondly... I count that as not showing up for work. Right. Which is probably worse than not attending a meeting. Right. It's a little broader sense of not being there. Secondly, when he was asked questions by medical assistants and others, he refused to answer. I'm not the center medical director anymore. I don't have to answer those questions. And third, when he was asked to model and to explain and enforce our clinical support model, he refused to do so. That's corporate. I'm not doing anything that deals with corporate. That was his attitude after he's demoted. He was demoted because he couldn't do this and we thought if we put him as a float physician there'll be less harm in doing that. And then he continued to do the same behavior. Okay, so he says that he didn't change his behavior I guess from the time you all purchased the business until the time you outed him and that he should not be penalized basically for being the person he was at the time you all started this new relationship. How do you respond to that? Well, it sounds like an estoppel argument, Your Honor, and I have never seen an estoppel argument argued in the workplace. We may work with people. To me, sometimes if you ask an attorney like me who deals with employment and labor things, you should have fired him earlier. That may be advice I would have given had they asked, but if they put up with it, that doesn't mean now that he can do that consistently. Okay, he also says that you all treated him or that Concentra treated him differently, that the standards for attendance and tardiness and some other things that apply to him were not enforced similarly to other people. Other people were given passes on late arrivals. I don't know whether those people were doctors or whatever, but that he was singled out for this, I guess, more intensive supervision and write-ups. How do you respond to that? I think there's two responses to that or two parts. First of all, he never said that. Dr. Keough never said that. His common-law wife, who was a medical assistant with him at the Livonia Clinic before he was demoted and at some of the other clinics that he would go to, said that. She said that she saw other doctors do this or that someone told her that we could get away with it and that Dr. Thomas told her as a medical assistant that you can go ahead and be late. No one else confirmed that, that hearsay testimony, and that came in. Dr. Keough never said that. Susie Francoeur said that, and Judge Stee noted that as lacking foundation and not admissible evidence. It's just not something that can come in in the motion for summary judgment. It certainly would not have been admitted at the time of trial. So that's the only issue. There was never any comparable shown. There was never any type of, oftentimes, as you know in these types of litigations, there will be a detailed analysis of comparable employees. There's nothing. In fact, one of the employees that Susie Francoeur talked about had passed away by the time that this testimony came out. I was getting to the formalities of asking for the leave. If he says I'm going to ask for it and I fire him before he's got a chance to put in the formal request, what's the law on that? Well, the law is on notice. It's not necessarily timing. Timing gets to the causation issue. As far as the notice issue, he has to give us enough information that we don't have to speculate as to what he's doing. And in this case, he didn't know what he was doing. I don't know how he could give us enough information as an employer not to speculate as to what he was doing. Now, I do think that the timing is interesting in this case. Before you move on, he claims, the other side claims that you admitted that you had notice of his request for... That's interesting. I've never seen that in the record. What did happen is that he did make the call and talk to Tom Sherritt, who was our local HR generalist for the southeastern Michigan area. There is a policy, and as the court is well aware, under FMLA there is a requirement, or that an employer can make it a requirement, that FMLA notice be given in a particular manner according to our policy. Dr. Kehoe knew that policy. One, because he admitted that he had read our policy, Concentris policy. Two, because he's an occupational physician. This is what he does. People who want FMLA certification or need to determine whether they have accommodations go to him to make those types of determinations, and he fills out the forms. Or at least those portions of the forms that he does. He has particular information on how this works. I would think so. And I say that not necessarily because he admitted it, although he admitted that's what he does. He does a good job. He's very familiar with this. I'm familiar with that because defending in labor and employment, that's where people go and where our employees send people. So it's not a layman who's unfamiliar with the law. Or our policy. He's very up on it. Right, and our policy. And according to the regulations, we can require him to go. And we had a third-party administrator for FMLA. In the policy it said, I have a request to this administrator. Here's how you do it, and go. He says, I went to Mr. Shearheart and said, I'm thinking about FMLA or ADA. Obviously knowing he's, if I can, on the bubble as far as his performance. He's been given his final warning. He's still late and he's having these problems. He knows a panel call is being made. And he says, I'm thinking about. I'm investigating. And then he tells that to Mr. Shearheart. Mr. Shearheart goes to the panel call, which is attended by counsel. And not me, but in-house counsel. And that's why the privilege was asserted for the substance of that discussion. But Mr. Shearheart said, I was at that panel call or participated in it, and I knew he had said, I'm investigating whether I'm doing FMLA or ADA. You say that's not enough. No, I don't think that's enough because that makes us... What if the jury would have believed that after what you just said, they said, boy, let's fire him before he gets the paperwork in. I think that they would probably more likely believe that he said that, let me put that in so that they can't fire me on the legitimate reasons. You could argue it either way. But what if they would have believed that as soon as he said he was thinking of taking it, they said, oh boy, we're already having trouble with this guy. Let's get rid of him before he actually gets the paperwork in. Well, even if they believe that, then we have to move then to the next step on the issue of causation and pretext. And this takes us right to the pretext argument. We gave a legitimate non-discriminatory reason for his termination, the long history of poor performance. This was, regardless of who it was, what they had, this was grounds for a person to be terminated. Certainly under FMLA, we can terminate someone even if they're on FMLA, if it's for a non-FMLA-related reason. But you already demoted him for that. No. We had demoted him because he wasn't able to act as the center medical director, and we put him in a job that we thought he could act more efficiently in and not hurt us any more than he did. When he got to that job, he continued that. So the demotion is really, it's not punishment. I don't see a demotion as punishment. I see it as a warning. This is the real warning. We're not going to let you screw up any more of our policies. And two, you better straighten up and fly right. Okay, but going back to Judge Bertelsman's question that I'm not sure you answered directly, Judge Bertelsman said, what if in this meeting, after he said, I'm thinking about this, I'm thinking about that, they said, oh, my goodness, we're already having trouble. Let's go ahead and fire this guy before he gets the leave completed. If you have that scenario, and we're not saying this is what happened. This is a hypothetical. If the company made that statement, why wouldn't that support a pretextual action? Well, I think that it would certainly make the analysis much more difficult. And I think before we got to the pretext, there would be, in that case, if that exact verbiage or something as specific was utilized, then it does indicate motivation. But there's nothing like that in this case. So in this case, you move on to the pretext there. And we had a legitimate, non-discriminatory reason to fire him, and no one, there is no evidence other than statements from Suzy Francor, his common law wife, that were hearsay and not based upon foundation. She didn't know what happened with physicians, especially physicians who had separate employment contracts. So in that regard, going back to your question, Judge Bertelsman, is that, in fact, the jury would not have gotten that far. They would have seen, okay, even if he had made that comment, there was a legitimate, non-discriminatory reason for his termination, and it is not defeated by pretext. And he would have moved there. With regard, if I may, to the causation argument that's made here, it was interesting because the cases that are cited, first of all, all the ADA cases say that we use a but for standard. I don't think that that's doubted. There is some question whether that's to be used in an FMLA interference case. I don't think we have really an interference case in here or an FMLA retaliation case, which I think that claim has been made. However, when you see the opinions that the trial courts have made based upon this court's rulings on causation generally, you see that they use the but for analysis in both or combined FMLA and ADA cases. There has not been a case that I have seen where it splits it out and says it's a different standard. The argument I've been hearing in this case in reading is from the plaintiff's side is, wait a second, that was that summary judgment. There's a different standard at the time that you instruct the jury. And unfortunately, maybe I haven't been practicing long enough, 34 years is enough, I think, but I've never seen any authority in federal law that there's a different standard for causation when you're looking at it from a summary judgment standpoint as to when you're looking at it as instructing the jury. It's the law. A prima facie case is a prima facie case. So in that case, I think that the clear experience from the decisions that have been decided recently on the but for standard is that the courts have applied the but for standard in the ADA accommodation cases and it's not clear that it applies in the FMLA retaliation case because these cases usually come together that the but for standard would apply because they do apply the McDonnell-Douglas standard. Your Honor, there are no other questions. My time is up and I appreciate your time. Thank you. Thank you, Mr. Baxton. Rebuttal, Mr. Palmer? Yes. I want to piggyback on what Judge Bertelsmann was asking. And the question was if in fact they talked about it at the panel discussion and if in fact he'd already been demoted for the behavior and they talked about his request for ADA at the panel discussion, couldn't a jury find that that was a reason? I want to cite specifically the two statements from Tom Tearshirt. Tom Tearshirt was the HR person that Mr. Kehoe went to. The first part I would like you to see is at page 81. The question was about Kehoe didn't follow policies. So I asked Mr. Tearshirt, would you be the appropriate person to discuss the request with? And he said yes. And would it be your function as an HR manager to see to it that his accommodation could be met? Yes. So he was talking to the precise person who acknowledges I'm the point person for FMLA. More telling is this is on page 81 and I asked him about this panel call where they're all on it discussing what to do with Dr. Kehoe. At page 83, I asked, what was the accommodation he was requesting? Tearshirt says, the ability to sit or stand, the ability to have an elevated workstation and to work a seven-hour day. So when they're having that panel discussion, they know exactly what Kehoe is requesting. It wasn't this amorphous investigation that they go on. And then I said to him, I asked what was discussed at the meeting? And he says, this specific request was discussed at the meeting on page 83. So the scenario that you're talking about, here's a panel call. They're talking about his specific request that they know about at a meeting where they're supposed to be talking about his discipline. And the question is, couldn't a jury find that the motivation for the discharge was the fact that let's get rid of this guy before he fills out the paperwork? That's exactly what a jury could find. I'm not going to tell you... Do you have any evidence of that? I mean, you're speculating that they could have done this, might have done that, but how do you get past the speculation stage? Well, the speculation stage is, I have testimony from people that tardiness was not a terminable offense. Thomas says, we never terminate anybody for tardiness. Susie Francor is not a medical assistant, albeit it was his common-law wife or girlfriend or whatever politically correct phrase you want to use, but she was a physician's assistant and she worked interchangeably with the physicians at Concentric Clinic. They carried out precisely the same job. And she says, I was specifically told by Thomas that tardiness is not an issue. So the same person that's writing up Kehoe who does the same job, that tardiness is not an issue. Now, she was his girlfriend. That goes to credibility. And as this court well knows, it's not Judge Stee's function, it was not his function at the time of the summary disposition hearing to make credibility judgments on whether or not this is pillow talk or whatever. That's for the jury. And this is a jury question. And that's where it should be sent back to the jury to decide. I can't guarantee we're going to win or what the jury is going to say, but certainly we're entitled to a crack in having people from the community decide what was the reason they got rid of him. He'd been there for 20 plus years and now when he's having back problems and he's old and he's asking for a specific time off, he's gone. That's enough for a jury to decide was that the reason or is it that he was tardy? Was that the reason they fired him today in my Chicago office? That's the president of the company. All right. Thank you, Mr. Newman. Thank you. Case will be submitted. May call the next case. Case number 174210, David Keeley versus Jefferson Sessions III, argument not to exceed 15 minutes per side. You may proceed for the petition. Thank you. Good morning. Good morning, your honors. May it please the court. My name is Victoria Lattice and I represent petitioner David Keeley. I'm reserving three minutes for rebuttal. Very well. Mr. Keeley became a lawful permanent resident of the United States over 20 years ago in 1997. In 2011, he was convicted of rape under Ohio law. The BIA found that that conviction qualified as an aggravated felony triggering Mr. Keeley's removal and leaving him no opportunity to seek discretionary relief. In doing so, the BIA erred. Under the categorical approach, the conduct criminalized by the Ohio statute is broader than the generic definition of rape in two ways, each of which is sufficient on its own to sustain Mr. Keeley's petition. First, Ohio statute is overbroad because it criminalizes circumstances in which a victim's ability to consent is substantially impaired. While the generic definition requires either that a victim did not consent or that the victim was incapable of consent. So you don't think that substantially impaired and incapable are not synonymous? And if you say they're not synonymous, what's the best case for supporting that position? No, Your Honor, those two standards are not synonymous. The most, I think, obvious case is the Ahmed case in which Ohio sustained a conviction for rape where the victim was depressed. She reported that she was in some type of dream state and that was sufficient for a substantial impairment. There's no case that I'm aware of in a state that uses an incapable standard that used depression as a basis for incapability. Even under facts where the victim reported having this dream state or anything like that, there's no case that I'm aware of or cited by the respondent that uses those facts to sustain an incapable standard conviction. The baseline of your argument is that Congress, when they enacted the Immigration Act, used a generic definition of the term rape while Ohio, their definition of rape is broader than the generic definition. And under the categorical approach, therefore, he may have been convicted of conduct which Congress did not intend to require automatic removal without discretion. I mean, that's your argument, right? Yes, that's correct, Your Honor. Okay, what authority do you have that Congress intended in the Immigration Act to use the generic definition of rape? So, Your Honor, when Congress doesn't define a term in the Immigration and Nationality Act, the Supreme Court says that we use the categorical approach. So as far back as Taylor's... Do they use generic definitions? Does the Supreme Court hold that, too? Yes, Your Honor, that when Congress has not specifically defined the term at issue or referenced some other statute, we do look to the generic offense. Okay, and have they so held in the Immigration Act context? Yes, Your Honor. Most recently in Esquivel, the Supreme Court applied the generic definition of sexual abuse of a minor. Okay, they applied it. Did they hold that we have to use it? Yes, Your Honor, the Court has held that in the circumstances where Congress doesn't give a specific definition, they did not. I think the generic definition is too narrow, you know, in the modern context that you look at what historically people considered rape and it was very limited, I mean, basically to sexual intercourse. And now I think the common understanding of the term rape is much broader than that. And to say that Congress when they enacted this in, was it 92? 1996, Your Honor. 1996, Congress still intended to use this old outmoded definition of rape that was limited to sexual intercourse and no other conduct, I think is somewhat unreasonable and unrealistic, isn't it? I don't think so, Your Honor. Why not? Congress considered an amendment to this exact provision to criminal sexual conduct, sexual abuse, sexual assault. Congress considered that exact language. That's different than rape. I mean, now rape, I think would be, I don't want to get too specific, but conduct other than just intercourse. That somebody forces themselves on the other person and does activities that may not be strictly sexual intercourse, but they'll still be rape now. I mean, that's what it is almost in all states, I think, right? So first, Your Honor, we don't... I think that Congress is stuck in the past. It's kind of hard for me to believe, that's all. First, Your Honor, we don't look to 2018. We look to 1996 when the statute... 1996, I think the rape statutes, at least all the ones I know, are much broader than what you say Congress intended. Well, Your Honor, the rape statutes in 1996 were not broader. So of the states that still had a statute called rape, a lot include digital penetration, which we've identified as one reason the Ohio statute is overbroad. Did they have separate statutes in 1996 that most of them cover something called rape and then something called sexual assault or some other variant of conduct? Or did they... In Michigan, we have sexual conduct of the first degree, and we've had it... I mean, I was on the Court since 88, and sexual conduct of the first degree is not only sexual intercourse, but it's digital penetration, it's oral penetration. They list it all out, and I think that's really kind of a model for all the states, at least as of 88. And to think that it's just now sexual intercourse, I'm kind of surprised. That's what you say the majority of the states defined rape as of 1994, but I'll look at it, but I kind of doubt it. Your Honor, how did the Model Penal Code define it? Yeah, they could define it broadly. In 96. 96, I'm sorry, I got the wrong date. The Model Penal Code defined rape as carnal knowledge, which was defined specifically as sexual intercourse. And to Your Honor's point... And it's limited to that? And nothing more? The term rape, yes, Your Honor. The Model Penal Code didn't refer to them as rape. So rape would be the highest level criminal sexual offense, and then... Okay, I guess Michigan maybe doesn't even use the term rape. You're charged with criminal sexual conduct in the first degree, and then it lists all of it. Yes, Your Honor. Michigan was actually the first state to change its statute, and did become, as Your Honor pointed out, a model for other states, to change their statute. All right, that's what I'm familiar with, because I come from Michigan. All right, thank you. So many states, Your Honor, when they restyled their statutes, like Michigan, to broaden the scope of conduct covered by the statute, used a term other than rape. So states repealed their rape statute and retitled the statute something else, which captures the idea that rape is a specific offense. Rape means sexual intercourse. Rape means sexual conduct. But that conduct is not rape. It may be sexual assault. It may be sexual abuse. But Congress didn't choose to use those terms in this provision of the INA. So in looking at this under the categorical approach, if the Ohio statute under which he was convicted is much broader than what's included in the INA, even if the conduct that's included in the IA is subsumed by the broader statute, hypothetically, are you still saying that under the categorical approach you would win? Yes, Your Honor. I think if I understand your question, if the conduct criminalized by Ohio is broader than the generic definition of rape,  I would note, Your Honor, that our position is not that this type of conduct couldn't render someone removable. There are certainly other provisions in the INA, but the aggravated felony provision of the INA is by far the strictest removal ground. It leaves no opportunity for discretionary relief. So our position is that Congress wasn't trying to say this conduct couldn't render someone removable, simply that it couldn't render someone removable under a hearing of some sort and the court could evaluate the case and make a determination on removability. That's correct, Your Honor. So, for example, if the conduct were deemed to be a crime involving moral turpitude, which it likely would be, a person could potentially have the opportunity to seek cancellation of removal. So an immigration judge could determine whether, despite their conviction, the person is not convicted of an aggravated felony. What the INA defines as an aggravated felony. There are opportunities for them to have their case reviewed by an immigration judge. So what is the specific, I just want to hear from you, what is the specific relief that you seek this morning? What would you have the court do if we assume your position is correct? Your Honor, we would ask that the person is not for an aggravated felony. He was not charged with any other removability grounds, but presumably could be. So likely I think this case would be brought back to immigration court if the government chose to charge him as removable, for example, as a crime involving moral turpitude. So likely this case would end up back before an immigration judge to decide whether Mr. Keeley should be given discretionary relief. But your remedy would simply be to reverse the immigration court. I mean, we're not reversing and remanding for anything else. You just want a straight reversal. That's correct, Your Honor, because the government didn't charge Mr. Keeley as removable under any ground yet. Correct, Your Honor. As to the issue of digital penetration, Congress did consider an amendment that would include a broader range of sexual conduct, including digital penetration. Congress explicitly rejected that amendment and ended up placing that language in other parts of the INA. So many other forms of sexual misconduct are in other parts of the INA, but Congress explicitly rejected including that in the aggravated felony provision, placing rape next to sexual abuse of a minor, showing that Congress intended rape when the conduct is committed against an adult, and a broader range of conduct to be an aggravated felony when the conduct is committed against a minor. So I think it's clear that Congress intended to make rape in the aggravated felony provision a very strict removal ground and a narrow removal ground. And I see that my time has expired. Thank you. Judge Donaldson. All right. Thank you. Did you reserve time for rebuttal? I did. Three minutes. That's great. You'll have your three minutes. Good morning. Good morning. May it please the Court, Karen Melnick on behalf of the United States. To accept Mr. Keeley's definition, narrow definition of rape in the INA would render the statute essentially a dead letter. It would be applicable to only 18 states. And where the purpose of the aggravated felony provision is to create categories of crimes under which state statutes would fit. And the aggravated felony provision is like an umbrella statute under which the state's crimes would fit. Reading it so narrowly was not Congress's intent. Well, but, you know, the Supreme Court in the Shamps case has told us when applying this categorical approach, we don't look at the underlying conduct. We look at, you know, the various elements. And if we're looking at that and looking at the, comparing this to the generic definition, don't we get into a situation where one of the Ohio statutes, for example, is much more, much broader, much more comprehensive than the language in the INA. And Congress certainly had the authority and other things, didn't they? Well, they did. But here's the thing, Judge Donald. You have 25 states. Right. We're looking at conduct. We're looking at elements. That's a categorical approach. So then you want to look at what is the conduct that the states are criminalizing in their rape statutes. Are you looking at it in 1996? Yes. Congress passed a statute or are you looking 22 years later? I'm looking at 1996. Now, there's nothing that's in the Supreme Court that says you cannot look in more recent time. But the arguments made today and what the board relied on is 1996. So I'm starting with statute. Ms. Lattis said that in 1996, Michigan, which I'm the most familiar with, was kind of the leader in this area of defining criminal sexual conduct in the first degree to include other things other than sexual intercourse. But the other states were way behind the ball and they were limited to defining rape solely as sexual intercourse. Do you disagree with that? I do disagree with that. My, you know, in combination with the board state survey, I pulled all 50 statutes from 1996. And 25 of the states and the District of Columbia covered the conduct to which Your Honor refers, the sexual intercourse, what would be historical sexual intercourse. And all 25 statutes and the District of Columbia called it something else other than using the word rape. In other words, like Your Honor's state of Michigan, other states referred to it as sexual assault in the first degree, first degree sexual abuse, sexual battery, criminal sexual assault, criminal sexual conduct in the first degree, sexual intercourse without consent, aggravated felonious sexual assault, et cetera. So there's all these different labels. But we know from the categorical approach and from Taylor that labels don't matter. It isn't the label. It's the conduct. So you have 25 states and D.C. that don't use that label. And on top of that, you have eight additional excuse me, seven additional states, including Ohio, the one that's particularly relevant here, that actually use the word rape in their statute, but include digital and mechanical penetration. So you have 32, 33 jurisdictions if we're talking about D.C. So 33 jurisdictions that cover rape. Did Congress define rape in the federal statute? They did not define rape in the INA, just like they did not define murder or sexual abuse of a minor. Again, and no cross reference either. So again, as I started, it's a category of crimes in the INA, aggravated rape, and the      crimes in the INA, and  criminal conduct.  again, you have 20 states  the word rape, and the digital penetration, and digital penetration, sexual penetration without consent, which includes also digital mechanical. So you're saying that generic definition of rape had changed in 1996 to include all these other types of rape that are different than sexual intercourse. So in Congress, generic definition must have incorporated the generic change definition that was at least by 25 states, or whatever you said. Is that your argument? It is. To show you that the labels don't matter, you've got Ohio, where this offense occurred, that actually uses the word. Are there any dictionary definitions that define rape broadly like this? Most of these statutes that you just read don't use the word rape. They use criminal sexual conduct first degree or aggravated or whatever it is. Like Michigan, I don't think we use rape. If we go to a dictionary, would we use rape? It depends on the dictionary you look at. It's kind of important though, isn't it? I know that the definition that is cited in Esquivel includes a broader definition than just what we would consider traditional common law. Even still, petitioners acknowledge, as of 1996, the definition of rape would be broader than, say, just male on female and you could certainly rape a spouse. I don't think they would go so narrow, but yet eight states in 1996 that used the word rape would be even narrower than petitioners definition. It would only be male, female, and you could rape your spouse. So, the definition, again, using that label, rape, is, it's meant to cover the conduct. Again, the element But didn't the federal statute also use a term in there, sexual abuse? Did it use sexual abuse of a minor? Okay. And so, certainly, that term is broader, but again, we're talking about kids. And so, you can have sexual abuse of a minor that doesn't even involve touching, or you have touching of outside the clothing. I mean, that is definitely a separate I understand that about the minors, but you're saying that Congress intended all of these other things. And I'm asking, where do you look to determine, based on the language of the statute, that Congress intended all of these other things at 1996 when they wrote this? Because I'm trying to get at the broader than and narrow than, and the argument makes sense, but I want to know where we discern that Congressional intent that you're alluding to. First, when, you know, the government's position is, when you're saying all these other things, I'm still limiting, I would say the generic definition is sexual nonconsensual sexual penetration, vaginal, anal. That's the definition. That's the conduct. Those are the elements. So if it's talking about what's doing the penetrating, really doesn't matter if it's nonconsensual and it's those two areas. So that's one thing. So then in terms of what did Congress intend, what's the contemporary, you know, at that time definition, I think you look to the states and how they're criminalizing the conduct, the elements. Because it's the states that are prosecuting these crimes. I mean, there is a federal, not even using the word rape, but covering that conduct definition in the United States code. But remember, the INA has to cover all 50 states. It has to capture that contemporary of that year definition. And rape in 1996, that conduct is criminalized by the states. It includes digital and mechanical. It isn't as if that's a separate crime in the states. If you look at the 1996 state statutes, it lists, and their most serious ones, the first degree variety, where sexual intercourse or the historical definition of that is included. And then it says, or another body part or digital or object. It isn't some separate offense, some lesser offense, punishable less than the traditional. So the argument, when Congress uses rape, they're referencing the state laws of rape. So therefore incorporating by reference what the states criminally prosecute as rape. And that includes digital penetration, and it's not the old common law definition of rape, like you said, just be a man and a woman, you can't rape your wife, all that old stuff. Okay. But how about their argument that Congress rejected amendments that would be broader and the rejections of the amendments show that they considered a narrow definition? I don't think there was any discussion of these different labels to cover the offenses, and I think that actually swings in the government's favor. I mean, think of, I have this, I rattled off, you know, that there's 13 different labels in 1996. I'm not talking about labels, they say weren't there amendments to the statute that were rejected? No, there was discussion in the legislative history about okay, we've got domestic violence and we have sexual abuse, and they were discussing different additional offenses to, and they're not defined. I mean, my look at the legislative history just says, there's a discussion, it says, Mr. President, we are considering these different offenses, and what ended up in the statute, 1101A43A, is sexual abuse of a minor, rape, and murder. But again, to have chosen, they could not have meant rape, the definition that Mr. Keeley is suggesting, because then what? It's only, persons are only removable in 18 states? But it sounds like you are agreeing that they did discuss these other things, and that since they're not included, they must have been rejected. But I want to go back, because it seems to me that just looking at the things on their face, forgetting their rationale, that the Ohio statute as written does criminalize more conduct than the federal statute. If it does criminalize more conduct, that makes it broader, and that brings us, for purposes  categorical problem, to whether or not this conviction falls within or without the federal definition. Your Honor's response was that they were referring to their definition of the federal definition, and that's the whole reason why we're here today. And I'm urging the court to find that the way the contemporary definition of rape, what is covered by rape, by 33 jurisdictions in 1996 includes digital penetration. The conduct, again, is non-consensual penetration. So, if 33 jurisdictions include digital, for Congress to say, well, rape is only, again, sort of this historical definition, then you're saying that they added rape and it's a dead letter, and that is not true. We would argue, also, with respect to the non-consensual aspect, that, as I think it was, Judge Donald, that there is no difference between substantially impaired, Ohio's definition of substantially impaired and incapable of consent. If you look at the cases, they can't point to a case, they're pointing to Ahmed, but if you look at, I see my time's up, if I could just... Please go ahead. Okay, thank you. They're sort of, I would say, cherry-picking the facts a little bit with respect to that case, if that's the only case they can point to, to say that, oh, that means Ohio's statute is overbroad with respect to incapable of consent. This is a situation where the woman involved had to go back to the doctor to confirm whether or not there had been intercourse. I don't think we get into the facts. If I could just have one moment. Sure. The 2016 Supreme Court case, Mathis versus the U.S., where they say, when comparing the conviction with the federal statute, we focus solely on whether the elements of the crime of conviction sufficiently match the elements, the term as used by Congress, while ignoring the particular facts of the case. So they're telling us, don't get bogged down in the facts. You're looking at these elemental things. Right. But when it comes to whether that is true, when you're trying to find what is the generic definition and looking at the elements that the states are covering with their rape statutes, yes, you look at the elements. But now with respect to coming up with comparing the statute, whether that's overbroad with respect to incapable versus substantial, they have to point to a case that says, okay, someone would be found not guilty of rape in Michigan, but would be found guilty of rape in Ohio, because, you know, their standards of determining whether something was nonconsensual is different. And there you have to look at the cases, you do have to look at the cases to see how the states are interpreting those elements. That's what I was getting at. And so they pointed to, as your Honor said, can you point to a case, and they mentioned this Ahmed case in Ohio. But if you look at the Ahmed case, you will see that this person, this victim, didn't have any idea what was going on. And the immigration nationality act in the aggravated felony provision, where you have murder without definition or cross-reference, sexual abuse of a minor without definition and cross-reference, and rape without definition and cross-reference, these are umbrella terms. And they are meant to capture the conduct that the states are criminalizing in 1996. And if you look at the state's statutes in 1996, the conduct they're criminalizing in there which covers rape, both historical, as we, common laws, we know it, also includes digital and mechanical. And not as a separate crime, but under their rape statute, however labeled. Thank you. Any further questions? Thank you. Thank you for your time. Thank you. All right, rebuttal? Yes, Your Honor. First to address the issue of which statutes should we be looking at. The amendment that Congress considered, the Senate actually had a draft of the amendment to the INA, where they considered including rape, aggravated sodomy, aggravated sexual abuse, sexual abuse, abusive sexual contact, or other crimes of sexual violence. Congress explicitly rejected that amendment, and instead chose to place the term rape next to the term sexual abuse. I'm sorry? I assume this is a Senate committee. Do we know why the Senate committee rejected that? Your Honor, there's no discussion in the legislative history of why they did that. Maybe they thought it was unnecessary. You don't know. Legislative history is always rather dubious to go to. We do know, Your Honor, that those terms, several of them, found themselves in other provisions of the INA. Our position is that Congress decided to use the narrow term in the strictest provision. I assume it just never got out of committee. You're not talking about Congress as a whole, but a majority of the committee of whatever committee it is. Being as may, it's somewhat interesting. So, Your Honor, it is our position that rape had changed its meaning by 1996. So the respondent is correct that we agree that by 1996, the vast majority of states considered rape to be a gender neutral offense and that there was no more marital exception to rape. How about digital penetration, and that's your big argument? Did 33 jurisdictions define rape in general as including digital penetration as   no, Your Honor. Only 8 jurisdictions called digital penetration rape in 1996. All right, called it, but how about, I mean, Michigan did say sexual misconduct is criminalized the same harsh manner. So, whether the label is rape or not, the number one prohibited sexual misconduct, whether you term it rape or first degree or whatever, did 33 states criminalize digital penetration to the ultimate degree? I believe that's correct, Your Honor, but our position is that in addition to the legislative history, placing the term sexual abuse of a minor next to rape would make the statute redundant if we assume that sexual abuse, which many states do term their highest category of sexual misconduct, sexual abuse, the statute would be rendered redundant if rape was followed by sexual abuse of a minor. I think you could have sexual abuse in the second degree or third degree, depending on the severity of the, whether you have force or, anyway, I don't think all sexual abuse is necessarily in the first  I think it's important to look at the elements of the state offense versus the generic definition. On the issue of consent, the elements are different in Ohio. Ohio uses a substantial impairment standard and the vast majority of states, 42 states and the District of Columbia specifically use the word incapable. Even among the other eight states, Ohio is the only state that uses this substantially impaired standard. On the issue of consent, the Ohio statute is certainly broader than the generic definition of consent. The statute is broad in either of the two ways, either on the digital penetration or on the issue of  Either one of those ways would make the statute overbroad. As far as the facts of Mr. Keeley's case, they're not relevant to the determination of the  We can look at these two statutes and compare them. Let's just say we find on the digital penetration part 1996 that the government is correct. Is your position that if we look at the language of the statute only on the consent language and we found that that was broader than the federal that you would still prevail? That's correct. The statute need only be overbroad on one of these grounds. Normally I don't do this, but can I have the government's position on the overbroadness of the consent portion of the Ohio? For a minute or two. Can you explain to me why you think that's not correct? Yes, your honor. She says only eight jurisdictions define consent as broadly or narrowly as Ohio, so Ohio's definition was out of touch with the generic definition of consent. How do you respond to that? Again, they're using label over substance. How Ohio labeled their non-consensual element of the offense, because this is rape is penetration without consent. What do you call without consent? Force is one, mental impairment is another. Incapable of consent, substantially impaired, that's where I was referring to the actual cases. How is Ohio, how does it play out in the courts in terms of how it's defined? If you look at how Ohio applies its statute and then you look at how those majority of other states, Alabama, Kansas, Michigan, California, et cetera, they're talking about incapable of appraising the nature, understanding the nature and consequences, unable to understand its act, its nature and possible consequences. In other words, they're all getting at the same thing. Was it nonconsensual? So the Ohio statute is not overbroad. Their substantial impairment is the same thing as incapable of consent, because if you look at the label might be incapable of consent, but then there's more to it than that. So if you look at just a moment. So they pointed, Your Honors, in their reply brief to four cases where they said this is overbroad that's incapable of consent as compared to Ohio. They go back to 1965 case. People will be blind. A 1987 case, and they're saying it's narrower in these other states than it is in Ohio. Indeed, it's not. They'd simply be speculating as to how a jury would determine whether or not the person is incapable or not. The bottom line is, to Your Honors' question, is that how Ohio applies substantially impaired is the same as how all those other states apply incapable. It's just a different label. Thank you. 30 seconds to reply to the reply. This is the end of it, by the way. Thank you, Your Honor. Yes, Your Honor, very briefly, the standards are not applied the same. The Ohio Supreme Court defines a substantial  a reduction, diminution, or decrease in an ability to understand. The states that use incapable standard require an entire preclusion to the ability to understand. Illinois v. Blount held that an IQ in the low 70s was not sufficient to render someone incapable. Arizona v. Blount held that an IQ in the low 70s was not sufficient to render someone  The states that use incapable standards require an entire preclusion to the ability to understand. The states that use incapable standards require an entire preclusion to the ability to  Thank you.